IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

SHERYL GARRISON, as parent and    )
next best friend of
NA'KIMA DIXON,                    )

    PLAINTIFF,                    )

VS.                               )      CV-02-H-0085-NE

WESFAM RESTAURANTS, INC.,         )

    DEFENDANT.                    )

**ENTERED**

**SEP - 4 2003**

## MEMORANDUM OF DECISION

The court has before it the June 30, 2003 motion of defendant Wesfam Restaurants, Inc. for summary judgment. Pursuant to the court's July 14, 2003 order, the motion was deemed submitted, without oral argument, on June 30, 2003.

### I. Procedural History

Plaintiff Sheryl Garrison, as parent and next best friend of Na'Kima Dixon, commenced this action on January 10, 2002 by filing a complaint in this court alleging that employer Wesfam Restaurants is liable for physical contact and sexual innuendo by a co-employee. (See Compl. ¶ 9.) Plaintiff contends that defendant's acts constitute: (1) sexual harassment under Title VII including constructive discharge; (2) assault and battery under state law; (3) invasion of privacy under state law; and (4) negligent and/or malicious retention, supervision, and training.

31

(See Compl. Counts I, II, III, IV.)  Defendant's June 30, 2003

motion for summary judgment asserts that Plaintiff has failed to

establish a prima face case for any of the above-listed claims.

(See Def.'s Mot. Sum. J.)

The parties have each filed briefs and submitted evidence in

support of their respective positions concerning the pending

motion for summary judgment.  On July 17, 2003, defendant

submitted evidence[1] in support of the motion and on July 28,

2003, defendant filed a supporting memorandum of law.  Plaintiff

submitted evidence[2] in opposition to the motion for summary

judgment on August 4, 2003 and filed a brief in opposition to the

motion on August 11, 2003.

**II. Standards for Evaluating a Summary Judgment Motion**

Under Federal Rule of Civil Procedure 56(c), summary

judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment

as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

_____

[1] Defendant submitted the November 25, 2002 deposition of
plaintiff Na'Kima Dixon with exhibits and the April 15, 2003
deposition of Betty Jean Harris with exhibits.

[2] Plaintiff submitted the August 4, 2003 declaration of
Na'Kima Dixon, the personnel file of Na'Kima Dixon, and the
personnel file of Don Howard.  Plaintiff refers to Defendant's
evidence submitted on July 17, 2003 in support of the motion for
summary judgment.

(1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real

3

Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the
moving party bears the burden of proof at trial, then it can only
meet its initial burden on summary judgment by coming forward
with positive evidence demonstrating the absence of a genuine
issue of material fact; i.e. facts that would entitle it to a
directed verdict if not controverted at trial.  See Fitzpatrick,
2 F.3d at 1115.  Once the moving party makes such a showing, the
burden shifts to the non-moving party to produce significant,
probative evidence demonstrating a genuine issue for trial.

     If the moving party does not bear the burden of proof at
trial, it can satisfy its initial burden on summary judgment in
either of two ways.  First, the moving party may produce
affirmative evidence negating a material fact, thus demonstrating
that the non-moving party will be unable to prove its case at
trial.  Once the moving party satisfies its burden using this
method, the non-moving party must respond with positive evidence
sufficient to resist a motion for directed verdict at trial.

     The second method by which the moving party who does not
bear the burden of proof at trial can satisfy its initial burden
on summary judgment is to affirmatively show the absence of
evidence in the record to support a judgment for the non-moving
party on the issue in question.  This method requires more than a
simple statement that the non-moving party cannot meet its burden
at trial but does not require evidence negating the non-movant's

4

claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[3]

On September 25, 2000, plaintiff Na'Kima Dixon was hired to work as a cashier for Wesfam Restaurants, Inc. at its Madison, Alabama Burger King location. (See Dep. of Na'Kima Dixon 22.) At the time she was hired, Plaintiff was provided a copy of Wesfam Restaurant's Employee Handbook ("the handbook"). (See id. at 23.) The handbook defines "harassment" to include, inter alia, "where verbal or physical advances unreasonably interfere

---

[3] If facts are in dispute, they are stated in the manner most favorable to the plaintiff. See Fitzpatrick, 2 F.3d at 1115.

with the individuals' work performance or create an offensive
working environment."  (See Def.'s Ex. 3 to Dep. of Na'Kima Dixon
73.)  If an employee feels that s/he has been harassed, the
handbook directs such complaint should be reported "immediately"
to "Mr. Terry Baughman, Vice President of Operations, Ms.
Tristenne Wessel, and/or your Area Supervisor."  (See id.)

     On the date she was hired, Plaintiff signed an
"Acknowledgment of Notification," attesting to the fact that the
handbook policies had been reviewed with her and that she had
been given the opportunity to ask questions regarding the
contents of the handbook.  (See id. at 26-7.)  All employees and
new hires to the Madison location Burger King were made aware of
the sexual harassment policy in the same way.  (See Dep. of Betty
Jean Harris 62.)  The policy with regard to sexual harassment and
discrimination was also posted in the crew room at the Madison
location Burger King.  (See id. at 62-3.)

     Plaintiff Na'Kima Dixon claims that she has been sexually
harassed at work.  Plaintiff asserts that shift manager Don
Howard acted on several occasions, beginning in March 2001, in a
manner that fostered an abusive work environment.  (Compl. ¶ 11-
12.)  Plaintiff alleges that Howard "ran" into Dixon several
times and rubbed her shoulders.  (See Dep. of Na'Kima Dixon 30-
36.)  The first three times Howard "bumped" into Dixon the
plaintiff did not report the incidents nor did she consider the

conduct to be sexual in nature.  (See id. at 38.)[4]

The fourth incident that Plaintiff complains of involved similar conduct.  Howard allegedly "brushed up against" the plaintiff and put his arms around her in apology.  (Id. at 40.) Dixon reported the conduct to her day manager.  (See id.)  The day manager responded to the complaint, stating that Howard was "just friendly" and that he "gets tense and runs into people." (Id. at 40-1.)

While Dixon asserts that similar conduct occurred "continually," (id. at 42), there is no evidence that these incidents were sexual in nature.  After each bumping incident, Howard would treat the contact as accidental and say "I'm sorry" or "pardon me."  (Id. at 51.)  Though Dixon testified that Howard would sometimes call her "babycakes," there is no evidence that the term was used in direct connection with the bumping incidents.  (See id. at 51-2.)

The fifth specifically alleged occasion of Howard bumping into Dixon occurred near the Store Manager's office and in the presence of the Store Manager, Jean Harris.  As Howard was leaving the office, Dixon alleges that she stepped aside to avoid contact with Howard.  (See id. at 44.)  Nevertheless, Howard stepped on Dixon's foot, then proceeded to apologize and rub

---

[4] Plaintiff Dixon, when asked in her deposition whether anything sexual was done these three times, responded: "Yes - no. Not in the three times, no."  (Id.)

Dixon's arm.  (See id. at 44-5.)  From observing the incident,
Store Manager Harris determined that the contact was accidental
and not a violation of the sexual harassment policy as
articulated in the employee handbook.[5]  (See Dep. of Betty Jean
Harris 135-36, 154.)  Nevertheless, Harris did caution Howard to
be more careful in order to avoid such contact in the future.
(See id. at 154.)

     At approximately the same time, Dixon herself also asked
Howard to stop rubbing her and to watch out where he was going.
(See Dep. of Na'Kima Dixon 52-3.)  Though Dixon asserts that
Howard did not verbally respond, she does concede that Howard
stopped bumping into her for "awhile."  (Id.)

     At some point thereafter (probably in April), Plaintiff
asserts that the sexually-tinged conduct and behavior of Howard
resumed.  When Dixon was standing in the narrow space around the
ice machine, Howard allegedly walked behind Dixon and "rubbed his
waist on me as I was standing there."[6]  (Id. at 46.)  Dixon
recognizes, however, that the space around the ice machine is
narrow.  (See id. at 47-8.)  In fact, Dixon asserts that the

------

     [5] Specifically, Harris's testimony is that "it was an
accident and he didn't see her because of the way he was walking
out of the office."  (Dep. of Betty Jean Harris 136.)

     [6] Dixon's deposition suggests that this incident may have
involved some genital contact.  When Dixon was asked whether
there was any contact with Howard's genitals, Dixon responded: "I
was standing and my back was facing towards him, and he walked
behind me and rubbed that area on me . . . ."  (See id. at 49.)

8

space is so confined as to preclude anyone passing from coming
into contact with another person already occupying the space.
(See id.)  Further, Dixon acknowledges that after Howard rubbed
up against her, he excused himself.  (See id. at 47.)

Dixon asked a co-worker, Marcus Parker, if he saw the
incident at the ice machine.  (See id. at 49.)  Parker allegedly
responded that he had seen the contact (see id.) and that Howard
"possibly" got "kind of close" (see Dep. of Betty Jean Harris
153).  Parker explained to Store Manager Harris what he had seen
at the ice machine after Dixon complained to Harris about the
incident.  (See Dep. of Na'Kima Dixon 49.)

Dixon alleges that later the same day, another incident of
unwelcome contact occurred.  Dixon needed the headset to work the
drive-thru window.  (See id. at 51.)  Since Howard had the
equipment at the time, Dixon asked him for it.  (See id.)  In
response, Howard "walks up towards me and he shoves his waist in
my face, and he tells me to take it off of him, unbuckle it from
him . . ." (Id.)  After Dixon refused to take the equipment off
of Howard's waist, Howard unbuckled the headset and handed it
over to Dixon.  (See id.)

Plaintiff contends that immediately after the headset
incident she complained to her Store Manager, Jean Harris.  (See
id. at 55-56).  Harris asserts, however, that at no time did
Dixon complain to her about Howard pointing to his groin area and

9

suggesting that Dixon take the headset off.  (See Dep. of Betty
Jean Harris 181).[7]  Notwithstanding this dispute, after Dixon
complained to Harris about the ice machine incident, Harris
reported the conduct via telephone to the Area Supervisor, Geri
Waggoner.  (See Dep. of Betty Jean Harris 139; Dep. of Na'Kima
Dixon 54.)

The following day, Waggoner contacted Dixon at home and
asked specific questions about the reportedly sexual conduct of
Howard.  (See Dep. of Na'Kima Dixon 55.)  Waggoner also informed
Harris to make written notes of Dixon's allegations; Harris did
so.  (See Dep. of Betty Jean Harris 119-20).  Harris included in
her written notes regarding the complaints lodged against Howard
observations that Dixon herself had engaged in a "doggy dance
[with] her hands down on her knees," i.e. "dancing in the
formation of a dog."  (See id. at 184, 146).  Harris testified in
her deposition that she included notes about Dixon's "doggy
dance" in the investigation of Howard because she considered the
"doggy dance" to be unusual and "could have had something to do

_____

[7] Harris testified in her deposition that the first time she
heard of the headset incident was in the course of the
deposition.  (See id.)  When questioned whether Howard's conduct
could be construed as a violation of the company's sexual
harassment policy, Harris commented: "No, because I've done that.
I've told an employee, I'm doing something, I'm expediting an
order, come get it because I can't actually free my hands up to
take the head set off."  (Id. at 170-71.)  When she was later
pressed in the deposition on this topic, Harris asserts that such
conduct could possibly rise to the level of sexual harassment.
(See id. at 181.)

with" the incidents of contact between Howard and Dixon.[8]  (See id. at 148).

Following the investigation of Dixon's complaints of sexual harassment, management conducted a meeting with Howard to discuss his behavior and remind him of and reinforce the sexual harassment policy.  (See Dep. of Betty Jean Harris 172.)  Harris, who was present at the meeting, testified in her deposition that Howard was also counseled as to various scenarios that could be construed by co-workers as sexual harassment.  (See id. at 172-75.)  Scenarios given to Howard at this time included acts of "unwanted touching" and "touching of the shoulder."  (Id. at 174.)  Howard was also verbally reprimanded at this time and was told that "further disciplinary actions would be taken if such an event [of unwanted touching] occurred again."[9]  (Id. at 175.)

After this counseling, Dixon lodged no further complaints of sexual harassment against Howard.  Dixon admits in her deposition that no additional incidents of "bumping" or other possibly

_____

[8] The incidents of dancing described in Harris's complaint did not directly involve Howard.  (See Dep. of Betty Jean Harris 150).  There is no evidence that Howard was working and/or present on the occasions that Dixon "danced" in the store. Nevertheless, Harris testified that the dancing would not have justified any sexual harassment on the part of Howard towards Dixon.  (See id. at 151).

[9] Harris testified that any later disciplinary action "could lead to your termination" even though at the time of the meeting "it wasn't stated flat out that it [would lead to] automatic termination."  (Id. at 176.)

11

sexually-tinged conduct occurred after Howard's counseling session.[10]  (See Dep. of Na'Kima Dixon 56.)

Approximately two or three weeks after Dixon's final complaint of sexual harassment, Don Howard quit his job at the Madison location Burger King.  (See id. at 61.)  Howard's personnel records indicate that "Don felt he could not do the job.  Also the amount of stress he placed on himself was more than what he could deal with."  (Howard personnel file 000064.)  Howard's personnel file also includes a note that Howard resigned because of the "atmosphere of the store."  (Howard personnel file 000059.)  Store Manager Harris recommended that Howard not be considered for rehire because he did not give the store two-week's notice.  (See Dep. of Betty Jean Harris 105-06.)

The plaintiff also terminated her employment at the Madison location Burger King shortly after the incidents described herein occurred.  Dixon readily asserts that she did not leave her employment because of the alleged incidents of sexual harassment. (See Dep. of Na'Kima Dixon 18.)  Rather, Plaintiff terminated her

_____

[10] According to the deposition:
Q: Did he ever run into you anymore?
A: No.
Q: Did he ever do anything of any kind of a sexual nature to you again?
A: No.
Q: Am I to understand that everything stopped after you -
A: By the time they finally talked to him.
Q: After Geri [Waggoner] intervened?
A: Yes.
(Dep. of Na'Kima Dixon 58.)

employment with the Madison location Burger King because she left
the Madison area to go to school in Tuscaloosa.  (See id.)  Dixon
does assert, however, that at the time of her resignation, she
asked if she could resume work during her Christmas break from
school.  (See id. at 63.)  Dixon asserts that at the time of the
request she was granted permission to return to work.  (See id.)
A precondition to returning, however, was that the request to
return be made within a year of the voluntary termination.  (See
id.)  Though Dixon asserts that she was in fact precluded from
working during Christmas break, (see id. at 63-4), there is no
charge in the complaint that Wesfam retaliated against Dixon for
bringing her complaints against co-worker Howard (see generally
Compl.).

On January 10, 2002, Plaintiff filed a Complaint in the
Northern District of Alabama alleging sexual harassment in the
form of an abusive work environment.  After a show cause order
for failure to serve was entered by this court on May 21, 2002,
the plaintiff served the defendant with the Complaint on June 6,
2002.

## IV. Applicable Substantive Law and Analysis

Plaintiff's complaint contains the following claims: (1)
sexual harassment including a constructive discharge claim in
violation of Title VII; (2) assault and battery under state law;
(3) invasion of privacy under state law; and (4) negligent and/or

13

malicious retention, supervision, and training under state law.
(See Compl. Counts I, II, III, IV.)  Defendant's motion for
summary judgment asserts that Plaintiff has failed to establish a
prima face case for any of Plaintiff's claims against defendant.
The court will address Plaintiff's federal law claims first.

**A.  Sexual Harassment in Violation of Title VII**

> **1.  Existence of an Abusive Work Environment**

Plaintiff asserts a claim of abusive work environment sexual
harassment, as that environment was allegedly created by the
actions of a co-employee.  Title VII provides that an employer
shall not "discriminate against any individual with respect to
his compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, *sex*, or
national origin . . ." 42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis
added).  Title VII has been interpreted to specifically allow
claims for sexual harassment to rest upon the theory of an
abusive work environment.[11]  See, e.g., Ellerth, 524 U.S. at 765;

_____

[11] The Ellerth and Faragher decisions indicate that courts
should no longer use the hostile work environment label in
analyzing whether an employer should be held liable on a Title
VII claim in which no tangible adverse employment decision has
been made.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742,
753, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775,
807 (1998).  Instead, in analyzing claims that heretofore
traditionally would have been labeled "hostile work environment"
claims, courts should now ask only whether the conduct complained
of "is sufficient to constructively alter an employee's working
conditions."  Frederick v. Sprint/United Management Co., 246 F.3d
1305, 1311 (11th Cir. 2001).

Faragher, 524 U.S. at 807; Henson v. City of Dundee, 682 F.2d 897, 902 (11th Cir. 1982) (asserting that an employee subjected to disparate treatment faces no requirement to show that s/he has suffered tangible job detriment and recognizing that harassment "which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality in the workplace that racial harassment is to racial equality"). A plaintiff attempting to show that s/he has been subjected to an abusive work environment must prove a number of elements to establish the claim. These elements include proof that: (1) the employee belongs to a protected group; (2) the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) the harassment must have been based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.[12]  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

---

[12] Though the issue will be discussed in section 2 of the Title VII abusive work environment analysis, it is important here to note that where a plaintiff fails to make the prima facie showing of an abusive environment, the court need not reach the issue of employer liability.  Even where the plaintiff successfully makes out a prima facie showing of harassment involving no tangible employment action, the defendant/employer is not summarily liable.  See discussion infra Part IV. A. (2).

15

A prima facie showing of a hostile work environment arises only where the sexual harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment." Faragher, 524 U.S. at 786 (citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986)).  Case law interpretations of the general standard announced in Meritor "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher, 524 U.S. at 788 (citing Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998). For example, offhand comments, isolated incidents (unless extremely serious), and other ordinary tribulations of the workplace will not amount to changes altering the plaintiff's terms and conditions of employment. See id. Furthermore, in order to be actionable under the statute, the work environment must be offensive on both an objective and a subjective level. That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 787.  This is a question to be determined with regard to the totality of the circumstances. Henson, 682 F.2d at 904.  Additional factors for courts to consider in the totality analysis include, but are not limited to, the frequency of the discriminatory conduct, the severity of

the conduct,[13] whether the conduct is physically threatening or
humiliating or a mere offensive utterance, and whether the
alleged conduct unreasonably interferes with an employee's work
performance.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22
(1993).

Therefore, the standard governing the abusive work
environment analysis "takes a middle path between making
actionable any conduct that is merely offensive and requiring the
conduct to cause a tangible psychological injury." Harris, 510
U.S. at 21.  A discriminatory work environment may exist absent
psychological harm to the plaintiff if, for example, the
environment distracts from the employee's job performance,
discourages employees from remaining on the job, or keeps
employees from advancing in their careers.  See id. at 22.  In
fact, a discriminatory work environment may exist even absent
tangible effects if the conduct did in fact "create a work
environment abusive to employees because of their . . . sex."
Id.

The severe, pervasive conduct alleged by Plaintiff in the
instant case consists of incidents during which co-employee
Howard would "walk into" or "brush up against" Plaintiff and rub

---

[13] Courts have stressed that the law requires the fact-
finder to examine not only the frequency of the alleged
harassment but also the gravity of the harassment.  See Vance v.
Southern Bell Tel. Co., 863 F.2d 1503, 1511 (11th Cir. 1989).

her shoulders, (see Dep. of Na'Kima Dixon 30-2, 40), as well as
one incident in which Howard suggested that Plaintiff take a
headset off of Howard's waist (see id. at 51).  This conduct
hardly rises to the level of an abusive work environment.  Though
Dixon asserts that the actions of Howard were continuous, (see
id. at 42), Dixon and Howard did not always work similar shifts
(see id. at 72).  Therefore, every time Dixon went to work she
was not subjected to the alleged acts of sexual harassment.
Furthermore, the allegations of "bumping" cannot be construed as
being severe.  At no time in her deposition did plaintiff Dixon
assert that she felt threatened or humiliated by Howard's
conduct.  (See generally id.)  In fact, there exists no evidence
in the record to suggest that the bumping incidents were anything
more than accidental in nature.  (Id.)  As noted earlier, Dixon
concedes that some of the areas in the Burger King location where
she worked were so narrow as to preclude anyone passing from
coming into contact with another person already occupying the
space.  (See id. at 47-8.)

    While the contact may well have been offensive to the
Plaintiff, the Supreme Court has repeatedly emphasized that a
cause of action for sexual harassment is limited to the most
extreme work conditions.  See, e.g., Faragher, 524 U.S. at 788;
Oncale, 523 U.S. at 81.  Only the most severe or pervasive
circumstances of harassment are actionable.  See, e.g., Oncale,

523 U.S. at 77 (finding a hostile work environment where an employee was "forcibly subjected to sex-related, humiliating actions" and "physically assaulted" and "threatened . . . with rape"); Splunge v. Shoney's, Inc., 97 F.3d 488, 489 (11th Cir. 1996) (noting that a hostile environment should not be contested where "employees grabbed plaintiffs, commented extensively on their physical attributes, showed them pornographic photos and videotapes, offered them money for sex, favored other employees who had affairs with them, speculated as to the plaintiffs' sexual prowess, and so on").  That is, Title VII does not regulate the general civility of employees.  See Faragher, 524 U.S. at 788.  To allow a claim to prevail against the conduct complained of in this case would require the court to govern the general civility of employees in the workplace.  This court refuses to do so.  Taking as true all of the conduct allegedly undertaken by Howard during Plaintiff's employment and there being no dispute of material facts, the court concludes that the totality of the incidents described by Plaintiff, while unseemly, are not "sufficiently severe or pervasive to alter the terms and conditions of [Plaintiff's] employment."  See Mendoza, 195 F.3d at 1245 (listing elements of hostile environment claim).[14]

---

[14] In fact, Plaintiff herself states in her deposition that she did not leave her employment because of the alleged incidents of sexual harassment.  (See Dep. of Na'Kima Dixon 18.)  Rather, Plaintiff terminated her employment with the Madison location

(continued...)

Because Plaintiff has failed to put forth a prima facie case of abusive work environment sexual harassment, defendant's motion for summary judgment is due to be granted with respect to Plaintiff's Title VII claims for sexual harassment.

### 2. Employer Liability for Co-Employee Sexual Harassment

#### a. Employer Notice of the Alleged Harassment

Alternatively, even if this court is in error and the incidents in Plaintiff's case are sufficiently severe to constitute an abusive working environment, Plaintiff's Title VII claim of sexual harassment cannot survive Defendant's motion for summary judgment.

Employer liability for actionable sexual harassment depends on whether the harassing worker is the victim's supervisor or merely a co-employee.[15]  See Faragher, 524 U.S. at 805-07.  When

_____

[14](...continued)
Burger King because she left the Madison area to go to school in Tuscaloosa.  (See id.)  Furthermore, the record is completely devoid of any evidence that the alleged behavior caused the plaintiff to dread going to work or otherwise affected her work performance.  (See generally id.)

[15] An employer is subject to vicarious liability for the actionable abusive environment created by the victim's supervisor.  See Faragher, 524 U.S. at 805-07.  Although Title VII provides no definition of the term "supervisor," the Faragher opinion indicates that the heightened liability applied in a supervisor context exists because a supervisor has "special authority enhancing [his] capacity to harass," id. at 800, which may be "'to hire and fire, and to set work schedules and pay rates . . .,'" id. at 803 (citation omitted).  Absent the authority to "hire, fire, demote, promote, transfer, or
(continued...)

the alleged sexual harassment is committed by co-workers, "a Title VII plaintiff must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action." Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003); see also Henson, 682 F.2d at 905. Actual notice exists where it can be shown that management knew of the alleged harassment. Id., citing Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278-80 (11th Cir. 2002). Actual notice is summarily established when an employer has a clear policy on harassment in place "that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures." Id., citing Breda v. Wolf

---

$^{15}$(...continued)
discipline an employee," a harasser will not qualify as a supervisor to impute vicarious liability on the employer. Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1034 (7th Cir. 1998).

    In this case, plaintiff Dixon makes no contention, and sets forth no evidence, that Howard was in a supervisory position over Plaintiff. Though the facts assert that Howard was employed as a shift manager, there is no evidence upon which to assert that Howard was Dixon's supervisor. Howard does not appear to have had the ability to hire, fire, demote, or promote Dixon, and therefore he cannot be titled a supervisor as that term is defined in the case law. Furthermore, Plaintiff's brief in opposition to summary judgment outlines the law pertinent to a claim for co-employee sexual harassment. See Pl.'s Memo. Of Law in Opposition to Def.'s Brief in Support of Motion for Summary Judgment 24-27. Therefore, the court considers Wesfam's liability in this case for the alleged sexual harassment of an employee *by a co-employee*, and not by a supervisor.

21

Camera & Video, 222 F.3d 886, 889 n. 3 (11th Cir. 2000).
Constructive notice is established where the alleged conduct is
so severe and pervasive that management reasonably should have
known about it, even absent actual notice.  Id.

In the instant case, it is undisputed that Wesfam
Restaurants was on actual notice of the alleged sexual
harassment, even though the plaintiff did not avail herself of
the proper channels to report that harassment.  See Breda, 222
F.3d at 888-90 (holding that employer had actual notice of
saleswoman's complaints of sexual harassment by a co-worker,
despite the fact that the plaintiff failed to take her complaints
to higher management when her supervisor did not respond). As
noted earlier, Wesfam Restaurant's policy on sexual harassment
states that any complaints should be reported immediately to "Mr.
Terry Baughman, Vice President of Operations, Ms. Tristenne
Wessel, and/or your Area Supervisor." (See Def.'s Ex. 3 to Dep.
of Na'Kima Dixon 28.)  Plaintiff acknowledges that she not only
received a copy of the handbook upon hire, but also that she was
given an opportunity to ask questions about the content of any
portion of the handbook.  (See id. at 26.)  Nevertheless, when
Dixon complained about the alleged harassment, she complained not
to any of the three individuals trained to deal with the issue as
listed in the handbook, but instead to her manager, Betty Jean
Harris.  (See Dep. of Jean Harris 119-20.)  Jean Harris was not

the Area Supervisor; Jean Harris was the restaurant manager at
the time of the alleged complaints.  (See id. at 11.)

Though Dixon did not make use of the proper channels to
report the alleged sexual harassment, this is not immediately
detrimental to her case.[16]  Dixon's manager Jean Harris contacted
the Area Supervisor, Geri Waggoner, regarding the sexual
harassment complaint.  Therefore, management knew of the alleged
harassment as of the date the incidents were reported to the Area
Supervisor.  See Blue Circle, 324 F.3d at 1259.  As a result,
Wesfam Restaurants was on actual notice of the sexual harassment
alleged in this case.  See id.

Since this court concludes that defendant Wesfam Restaurants
was on actual notice of the alleged abusive environment, there is
no need to extensively consider whether the defendant was also on
constructive notice of the alleged harassment.  In fact,
constructive notice is often considered only in those instances

_____

[16] Case law generally asserts that the person complained to
about the harassment must be either: (1) the person designated in
the company's formal policy; (2) someone considered to be a
member of management by the company; or (3) someone who has a
duty to report to higher management such a complaint.  See
Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752, 754
(11th Cir. 1996).  Further, where an employer has a policy on
harassment that states on its face that it "should" be followed,
the policy is interpreted by some courts to be a suggested, but
not mandatory, course of action.  See Breda, 222 F.3d at 890. In
the case at issue, while Plaintiff did not follow the procedures
outlined in the company handbook, she did report the conduct to
Betty Jean Harris, a manager with Wesfam.  (See Dep. of Betty
Jean Harris 119-20.)

23

where there is no harassment policy, "or where there is an ineffective or incomplete policy." Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).  It is clear in this case that there was indeed a mechanism in place to deal with complaints of sexual harassment.  Furthermore, the plaintiff has offered no evidence to suggest that the company's sexual harassment policy was ineffective.

Constructive knowledge of harassment can be imputed to an employer by considering the totality of the circumstances. Factors to consider in making a determination of constructive knowledge include: the number and severity of any incidents; whether the incidents were open and pervasive or generally concealed from the scrutiny of others; the location of the harassment as compared with the location of management; whether the harassment occurred as distinct acts separated by long periods of time or took place on a more continuous nature; and whether the victim of the harassment was a full-time or a part-time employee.  See Allen v. Tyson Foods, Inc., 121 F.3d 642 (11th Cir. 1997) (citing Faragher, 111 F.3d at 1538); see also Vance, 863 F.2d at 1512-13.

It is notable that the alleged harassment in the instant case did not rise to the level of being "so severe and pervasive that management reasonably should have known of it."  Miller, 277 F.3d at 1278.  While the "bumping" incidents may have occurred on

24

several occasions, they certainly were not severe enough to alter
or interfere with the plaintiff's work performance.[17]  While Jean
Harris, a representative of management, observed one of these
unconcealed "bumping" incidents, she did not interpret the
behavior to be sexual harassment.  The headset incident occurred
only one time, and can be characterized as an offhand incident,
the prohibition of which would turn Title VII into a general
civility code.  In light of the totality of these circumstances,
Wesfam Restaurants cannot be charged with having constructive
knowledge of the sexual harassment complaints presented by Dixon.

> b. **Employer's Immediate and Appropriate
> Corrective Action**

Even though defendant Wesfam Restaurants had actual
knowledge of the sexual harassment alleged in this case, the
employer is not summarily liable.  Rather, if an employer with
notice of harassment "takes immediate and appropriate corrective
action, the employer is not liable for the harassment."  Blue
Circle, 324 F.3d at 1260 (citing Miller, 277 F.3d at 1280 and
Fleming v. Boeing Co., 120 F.3d 242, 246 n. 4 (11th Cir. 1997)).
That is, the employer must take "prompt remedial action after

_____

[17] Even had the incidents described in the case been severe
or pervasive enough to alter the work conditions, this conduct
alone would not be sufficient to put an employer on constructive
notice of harassment.  See Faragher, 111 F.3d at 1538.  Rather,
the more important inquiry is whether the harassment was so
obvious and unconcealed that defendant's management team should
have known of the abusive environment.  See id.

receiving notice of the alleged sexual harassment." <u>Kilgore</u>, 93 F.3d at 754. The remedial action taken by the employer must be "reasonably likely to prevent the misconduct from recurring."[18] <u>Id.</u>, citing <u>Guess</u>, 913 F.2d at 465. Therefore, Plaintiff bears the burden to prove not only that she was subjected to co-employee sexual harassment, but also must produce evidence of a significant shortcoming in Wesfam Restaurant's response in order to hold the employer liable under Title VII. See <u>Saxton</u>, 10 F.3d at 535.

Wesfam Restaurant's remedial efforts were both timely and reasonably likely to prevent the conduct underlying Plaintiff's complaint from recurring. It is undisputed that Wesfam acted "with sufficient dispatch." <u>Id.</u> Geri Waggoner, the Area Supervisor, began conducting an investigation of the sexual harassment complaints the day after she received notice of the complaints.[19] (<u>See</u> Dep. of Jean Harris 139; Dep. of Na'Kima

_____

[18] This standard is based on negligence and closely resembles the "fellow servant" rule. <u>Guess v. Bethlehem Steel Corp.</u>, 913 F.2d 463, 465 (7th Cir. 1990). Under the fellow servant rule, as under Title VII, "the employer . . . is liable for that employee's torts against a co-worker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action." <u>Id.</u> Furthermore, Title VII "requires only that the employer take steps reasonably likely to stop the harassment." <u>Saxton v. American Tel. & Tel. Co.</u>, 10 F.3d 526, 536 (7th Cir. 1993).

[19] Case law supports the finding that management's response the day after notice of sexual harassment is "prompt" and "immediate." In <u>Kilgore</u>, management began investigating sexual

(continued...)

Dixon 54-5.)  Though Dixon had not used the proper channels to report the harassment as dictated in the employee handbook, the Area Supervisor was made aware of the complaints by Betty Jean Harris the day Dixon complained and requested remedial action. (Id.)

There is no dispute that the corrective action undertaken by Wesfam Restaurants prevented the conduct from recurring. Following the investigation of the sexual harassment complaints, Howard was immediately counseled.  (See Dep. of Jean Harris 172-75.)  Plaintiff admits that following this counseling session, Howard's harassing conduct completely and permanently ceased. (See Dep. of Jean Harris 172.)  Though Howard was not terminated for the alleged harassment, the evidence shows that Howard voluntarily terminated his employment at the Madison Burger King shortly after he had been counseled.  (See Dep. of Na'Kima Dixon 61.)

Therefore, the company's decision to counsel Howard was a sufficient safeguard against any recurrence of the harassment. Though the plaintiff contends that Howard should have been discharged as a result of the sexual harassment complaints, this contention is not supported by case law.  See, e.g., Farley, 115

_____

[19](...continued) harassment complaints two days after those complaints were lodged.  Kilgore, 93 F.3d at 754.  The Eleventh Circuit concluded that the company's response to the plaintiff's complaints were both "prompt and effective."  Id.

27

F.3d at 1554-55 (finding that an employer took "prompt and effective remedial action" where it immediately investigated Plaintiff's allegations of a sexually hostile work environment, interviewed all staff members, prepared a detailed summary of findings, and took disciplinary action against the alleged harasser); Larkin v. Baylor Medical Center of Irving, 1999 U.S. Dist. LEXIS 7106 (N.D. Tex. May 7, 1999) (finding that while a plaintiff "may disagree with [the employer's] choice of remedial action, her opinions and beliefs are not sufficient to raise a fact issue on this element of her claim"). Since Howard's behavior ceased after the counseling, Wesfam Restaurants has taken appropriate corrective action.

There is no dispute as to any material fact, and defendant has affirmatively demonstrated that Wesfam Restaurants, Inc. exercised appropriate remedial action and corrected the alleged harassment. Accordingly, defendant's motion for summary judgment is, for that separate reason, also due to be granted with respect to Plaintiff's Title VII claim for sexual harassment in the form of an abusive work environment.

### 3. The Constructive Discharge Claim

There is no evidence upon which the plaintiff can support her claim for constructive discharge from her employment at the Madison location Burger King. A claim for constructive discharge arises only where the employer "*makes* an employee's working

conditions so intolerable that the employee is forced into a voluntary resignation." Saxton, 10 F.3d at 536 (citing Weihaupt v. American Medical Ass'n, 874 F.2d 419, 426 (7th Cir. 1989) (emphasis in original)).  Whether the work environment of the plaintiff meets this standard is evaluated from the viewpoint of a reasonable employee.  See id.

There is no evidence in the record to support Dixon's claim for constructive discharge under the reasonable person standard. The plaintiff readily admits in her deposition that she terminated her employment at Burger King not because of the alleged incidents of sexual harassment but rather because she had moved to Tuscaloosa to finish school. (See Dep. of Na'Kima Dixon 18.)  However, Plaintiff's brief in opposition to summary judgment states that her constructive discharge claim is based on Burger King's failure to re-hire her during her Christmas break from school. (See Pl.'s Memo. In Opposition to Def.'s Motion for Summary Judgment 28.)  While Plaintiff's personnel file does indicate that Dixon would be eligible for rehire, there is no indication that Wesfam refused to re-hire Dixon because of the complaints she lodged against Howard.  Further, Plaintiff does not allege that she has been retaliated against for reporting Howard to management.

Since there is a lack of evidence that Dixon has been constructively discharged, defendant's motion for summary

judgment is, for that reason, also due to be granted with respect to Plaintiff's Title VII claim of constructive discharge.

**B.   The State Law Claims**

The plaintiff claims that Wesfam Restaurants is liable for the torts of assault, battery, invasion of privacy, and negligent and/or malicious retention, supervision, and training as those claims exist under Alabama state law.  (See Compl. Counts II, III, IV.)  Since this court has herein decided that the federal claims are to be dismissed on summary judgment, the court declines to rule on the state law claims, which will be dismissed by a separate order, without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).

In summary, the court finds that no material issues of fact remain and that defendant Wesfam Restaurants, Inc. is entitled to judgment as a matter of law as to all federal claims asserted by Plaintiff.  A separate final order will be entered.

DONE this _4th_ day of September, 2003.


SENIOR UNITED STATES DISTRICT JUDGE

30